## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------x

IN THE MATTER OF COMPLAINT OF
DELAWARE BAY LAUNCH SERVICE,
INC. AS OWNER OF "BIG STONE 5", A
51-FOOT   1985   CREWBOAT,   FOR
EXONERATION FROM OR LIMITATION
OF LIABILITY

-------------------------------------------------------x

CIVIL ACTION
IN ADMIRALTY

No. 06-345 (GMS)


### MOTION FOR SUMMARY JUDGMENT

Claimant, Richard Greer, by his attorneys, Gilbert F. Shelsby, Jr., Michael J. Logullo,

Shelsby & Leoni, Paul D. Bekman, and Salsbury, Clements, Bekman, Marder & Adkins, moves for

summary judgment, and states as follows.

1.      Petitioner filed this Action on June 2, 2006, seeking limitation of liability under 46

U.S.C.S. § 181, et seq.  In the Petition, Petitioner sought limitation of liability for a vessel known

as the BIG STONE 5.

2.      There is no dispute of material fact that the BIG STONE 5 was not involved in the

subject incident.  Accordingly, summary judgment is appropriate against Petitioner and the Petition

should be dismissed with prejudice

3.      Claimant adopts and incorporates the attached Memorandum in Support of Motion

for Summary Judgment, including all attached Exhibits.

WHEREFORE, Claimant, Richard Greer, requests this Court to grant this Motion for

Summary Judgment and dismiss the Petition with prejudice.

__/s/ Paul D. Bekman_____
Paul D. Bekman
bekman@scbmalaw.com
SALSBURY, CLEMENTS, BEKMAN
MARDER & ADKINS, LLC
450 W. Pratt Street, Suite 450
Baltimore, MD 21201
410.539.6633
*Attorneys for Claimant*

DATED: March 14, 2008

__/s/ Michael J. Logullo_____
Michael Logullo
mlogullo@mslde.com
SHELSBY & LEONI
221 Main Street
Stanton, DE 19804
302.955.6210
*Attorneys for Claimant*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

```
---------------------------------------------------------x
```

IN THE MATTER OF COMPLAINT OF
DELAWARE BAY LAUNCH SERVICE,
INC. AS OWNER OF "BIG STONE 5", A
51-FOOT 1985 CREWBOAT, FOR
EXONERATION FROM OR LIMITATION
OF LIABILITY

```
---------------------------------------------------------x
```

CIVIL ACTION
IN ADMIRALTY

No. 06-345 (GMS)

## MEMORANDUM IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

Claimant, Richard Greer, by his attorneys, Gilbert F. Shelsby, Jr., Michael J. Logullo,

Shelsby & Leoni, Paul D. Bekman, and Salsbury, Clements, Bekman, Marder & Adkins submits

this Memorandum in Support of Motion for Summary Judgment, and states as follows.

### Factual Background

The instant action commenced on June 2, 2006, with the filing of Delaware Bay Launch

Service, Inc.'s Petition for Exoneration From Or Limitation Of Liability. *See* Exhibit 1

(Petition). The Petition sought exoneration from or limitation of liability with respect to the

vessel the BIG STONE 5. The underlying action for which Petitioner sought limitation of

liability is *Greer v. Delaware Bay Launch Service, Inc.*, Superior Court of the State of Delaware,

New Castle County, Civil Action No. 06C-03-341 (PLA). In that action, Richard Greer has sued

Petitioner for injuries sustained while he was being transported on a launch boat from Big Stone

Beach Anchorage to a seagoing vessel, the ASTRO CAPELLA, on April 10, 2003. *See* Exhibit 2

(State Court Complaint). That action has been stayed pending resolution of the instant Petition.

*See* Exhibit 3 (Restraining Order).

On November 6, 2007, David Lewis was deposed in the instant case. Mr. Lewis was the operator of the vessel on which the Claimant was injured on April 10, 2003. Mr. Lewis testified that the vessel was the BIG STONE EXPRESS. *See* Ex. 4 (Deposition of David Lewis) at 38-39. On January 10, 2008, H. Hickman Rowland, Jr. was deposed. Mr. Rowland is the president of Petitioner Delaware Bay Launch Service, Inc. *See* Exhibit 5 (Deposition of H. H. Rowland, Jr.) at 5-6. At Mr. Rowland's deposition, for the first time – despite prior requests that it be produced – Petitioner produced the launch ticket documenting Mr. Greer's voyage on April 10, 2003. *See* Ex. 5 at 24-28. That launch ticket confirms Mr. Lewis's testimony and proves that Mr. Greer was a passenger on the BIG STONE EXPRESS. *See* Exhibit 6 (Launch ticket); *see also* Ex. 5 at 28.

### Argument

Rule F(2) of the Supplemental Rules for Certain Admiralty and Maritime Claims requires that the Petition assert "all facts necessary to enable the court to determine the amount to which the owner's liability shall be limited," including the voyage date and location, and the value of the vessel. To that end, the Petition here states that the vessel is the "BIG STONE 5," "a *51-foot* 1985 crewboat . . . equipped with two 800-horsepower Daewoo engines." *See* Exhibit 1 at preamble and ¶ 3 (emphasis added). It also references the subject accident involving Claimant Richard Greer on April 10, 2003 and mentions the Delaware State Court action. *Id.* at ¶ 5, 12. The Affidavit of Value for the vessel swears that it is worth $100,000. *See* Exhibit 7 (Affidavit of Value); *see also* Ex. 1 at ¶ 11.

BIG STONE EXPRESS, the vessel proven by Claimant's launch ticket to be the vessel involved in the underlying incident and lawsuit, on the other hand, is a *77-foot* vessel, clearly

very different from the BIG STONE 5. *See* Ex. 5 at 14; Ex. 6. This Court simply does not have "all facts necessary" to enable it to determine the value of the BIG STONE EXPRESS, including an Affidavit of Value for that vessel.

Petitioner was in the best position to know the identity of the vessel on which Claimant was injured.[1] It was the owner of that vessel, and has been in possession of the launch ticket that definitely proves that vessel was the BIG STONE EXPRESS since Mr. Greer was injured in April of 2003. Armed with this knowledge, Petitioner nevertheless proceeded to file a Petition to limit its liability with respect to the BIG STONE 5, the wrong vessel.

In sum, there is no genuine dispute of fact that the vessel upon which Claimant was injured was <u>not</u> the BIG STONE 5, but rather, was the BIG STONE EXPRESS. Because Petitioner seeks exoneration or limitation of liability for the BIG STONE 5, a vessel that undisputedly was <u>not</u> involved in Claimant's underlying lawsuit, summary judgment is proper, and the Petition must be denied as a matter of law.

### Conclusion

Wherefore, Claimant, Richard Greer, respectfully requests that this Court grant this Motion for Summary Judgment and dismiss the Petition with prejudice.

---

[1]Claimant was unaware that the vessel on which he was injured was the BIG STONE EXPRESS until Petitioner finally produced the launch ticket on January 10, 2008 at Mr. Rowland's deposition.

/s/ Paul D. Bekman

Paul D. Bekman
bekman@scbmalaw.com
SALSBURY, CLEMENTS, BEKMAN
MARDER & ADKINS, LLC
450 W. Pratt Street, Suite 450
Baltimore, MD 21201
410.539.6633
*Attorneys for Claimant*

/s/ Michael J. Logullo

Michael Logullo
mlogullo@mslde.com
SHELSBY & LEONI
221 Main Street
Stanton, DE 19804
302.955.6210
*Attorneys for Claimant*

DATED: March 14, 2008

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

-----------------------------------------------x

IN THE MATTER OF COMPLAINT OF
DELAWARE BAY LAUNCH SERVICE, INC. AS
OWNER OF "BIG STONE 5", A 51-FOOT 1985
CREWBOAT, FOR EXONERATION FROM OR
LIMITATION OF LIABILITY

CIVIL ACTION
IN ADMIRALTY

No.

-----------------------------------------------x

## COMPLAINT FOR EXONERATION
## FROM OR LIMITATION OF LIABILITY

Plaintiff, Delaware Bay Launch Service, Inc. (hereinafter "Petitioner") as owner of "BIG

STONE 5", a certain 51-foot 1985 crewboat built by Breaux Brothers Enterprises (hereinafter

"the Vessel"), by and through its attorneys, Palmer Biezup & Henderson LLP, hereby petitions for

exoneration from or limitation of liability pursuant to 46 U.S.C. §§ 183-189, and in support

thereof avers upon information and belief as follows:

1.  This is an admiralty and maritime claim within the meaning of Rule 9(h)  and

Rule F of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal

Rules of Civil Procedure.

2.  Petitioner Delaware Bay Launch Service, Inc. is a corporation organized under

and existing pursuant to the laws of the State of Delaware with an office and place of business at

100 Passwaters Drive, Route 36 East, Milford, Delaware 19963.

3.  The Vessel is a 51-foot 1985 motor crewboat built by Breaux Brothers Enterprises

and is equipped with two 800-horsepower Daewoo engines.

MAR - 9 2006

4.       At all times material hereto, Petitioner was the owner of the Vessel and a party entitled to petition for exoneration from or limitation of liability within the meaning of the Revised Statutes of the United States.

5.       On or about April 10, 2003, while upon the navigable waters of the United States, the Vessel was allegedly involved in an incident that has given rise to claims and potential claims including the claims of Richard Greer as more fully set forth in an action in the Superior Court of the State of Delaware, New Castle County, entitled " Richard Greer, Plaintiff, versus Delaware Bay Launch Service, Inc., Defendant" and assigned civil action number 06C-03-341 (hereinafter the "Incident").

6.       Any and all injuries and damages allegedly resulting from the Incident were not caused by or attributable to any fault, design, neglect or want of due care on the part of Petitioner, or anyone for whom Petitioner may be responsible, and any and all such alleged damage was occasioned and occurred without Petitioner's privity or knowledge.

7.       Prior to and on April 10, 2003, Petitioner used due diligence to make the Vessel seaworthy for the service for which it was engaged.

8.       Based upon the information presently available, as a result of the Incident, claims have been made which could potentially exceed Petitioner's interest in the Vessel, said value of possible claims being specifically denied by Petitioner.

9.       There was no freight pending which was due and payable to Petitioner at the time of the Incident.

10      Upon information and belief, there were and are no unsatisfied liens or claims of liens pending against the Vessel arising from the Incident or the voyage described herein.

11      Petitioner's interest in the Vessel after the Incident was $100,000.00. (See Affidavit of Value which is attached hereto and incorporated herein by reference).

12      A suit has been commenced by Richard Greer for alleged injuries or losses resulting from the alleged Incident of April 10, 2003 in the Superior Court of Delaware, New Castle County.

13      Upon information and belief, there are no other suits pending against Petitioner or the Vessel or any claims or demands prior or paramount to those which may arise by reason of the Incident.

14      Petitioner denies any and all liability for any loss, damage or injury which may be claimed by any person or entity arising out of the Incident, and therefore, demands exoneration from liability.

15      In addition, and in the alternative, Petitioner claims the benefit of limitation of liability as provided for in the Revised Statutes of the United States and the various amendments and supplements thereto and, more particularly, the United States Limitation of Shipowners' Liability Act, 46 U.S.C. §§ 183-189.

16      Petitioner is ready, able and willing and hereby offers to provide security for the value of Petitioner's interest in the Vessel following the Incident, interest at the rate of 6% per annum, and costs, by depositing with the Court a bond in approved form.

PBH: 183023.1

-3-

17.     All and singular, the premises are true and within the admiralty and maritime jurisdiction of the United States and this Honorable Court.

WHEREFORE, Petitioner prays:

A.     That if deemed necessary by the Court or at the reasonable request of any claimant, the Court cause due appraisement to be made of the value of Petitioner's interest in the Vessel.

B.     That the Court order Petitioner to file an <u>Ad Interim</u> Stipulation with surety pending any demand for appraisal of Petitioner's interest in the Vessel.

C.     That the Court enter an Order directing the issuance of a monition to all persons claiming alleged damages for any and all losses, damage, injury or destruction done, occasioned or incurred by, or resulting from, the Incident or occurring during the voyage upon which the Vessel was then engaged, citing them to appear before this Honorable Court and make due proof of their claims, and also to appear and answer the allegations of this Complaint according to the laws of this Court on or before a certain time to be fixed by the monition, or be thereafter barred from making any such claims against Petitioner, its agents, representatives, crew members or any person on whose behalf Petitioner may be liable or against the Vessel.

D.     That the Court enter an Order directing that upon the giving of an <u>Ad Interim</u> Stipulation, an injunction shall issue restraining the further prosecution of any and all suits, actions and proceedings which may have already begun to recover for alleged damages sustained as a result of the Incident and further enjoining the commencement or prosecution

thereafter of any suit, action or legal proceeding of any nature against Petitioner, its agents, representatives or any other person in respect to any claim or claims arising out of the Incident.

E.    That the Court in this proceeding adjudge:

(i)    that Petitioner is not liable to any extent for any loss, damage or injury for any claim whatsoever in any way arising out of or in consequence of the Incident and, therefore, is entitled to exoneration, or

(ii)    if Petitioner shall be adjudged liable and the claims are affirmatively proven, then such liability for all claims shall be limited to the amount of the value of the Petitioner's interest in the Vessel after the Incident and that Petitioner be discharged therefrom upon the surrender of his interest in the Vessel and that the limitation fund be divided *pro rata* among any claimants as may duly prove their claims, saving to all any priorities to which they may be legally entitled, and that a decree may be entered discharging Petitioner from all further liability.

F.    That Petitioner may have such other and further relief as this Court may deem just and proper in the circumstances.

PALMER BIEZUP & HENDERSON LLP

By _____
Michael B. McCauley (ID 2416)
1223 Foulk Road
Wilmington, DE 19803
(302) 594-0895
(302) 478-7625 (fax)
mccauley@pbh.com

Dated: May 24, 2006

PBH: 183023.1

-5-

## VERIFICATION

Michael B. McCauley, being duly sworn, does depose and say:

I am a partner in the law firm of Palmer Biezup & Henderson LLP, attorneys for Petitioner Delaware Bay Launch Service, Inc.;

I have read the foregoing Complaint and all the allegations of fact contained therein are true and correct to the best of my knowledge, information and belief, which is based upon information obtained during the course of counsel's investigation;

I certify under penalty of perjury that the foregoing is true and correct.

Executed on May 24, 2006

Michael B. McCauley

PBH: 183023.1

EFiled: Mar 31 2006 4:48 EST
Transaction ID 10941332

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| RICHARD GREER, | ) | C.A. No. _____ |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | NON-ARBITRATION CASE |
| DELWARE BAY LAUNCH SERVICE, INC., | ) | |
| | ) | |
| Defendant. | ) | TRIAL BY JURY OF |
| | ) | SIX DEMANDED |

## COMPLAINT

Plaintiff, Richard Greer, by his attorneys, Gilbert F. Shelsby, Jr., and **MORGAN SHELSBY & LEONI**, sues the Defendant, Delaware Bay Launch Service, Inc., under the general maritime law, and states as follows:

1.    The Plaintiff, Richard Greer, is resident of the State of Delaware residing at 18331 Sand Hill Road Georgetown, Delaware 19947.

2.    The Defendant, Delaware Bay Launch Service, Inc.("Launch Service"), is a Delaware Corporation whose principal place of business is in New Castle, Delaware and its registered agent is H. Hickman Rowland, Jr., 120 The Strand, New Castle, Delaware 19720.

3.    That at all times hereinafter mentioned, the Defendant, Launch Service, owned, operated and had in its possession and control a vessel, BIG STONE 5.

4.    That it was the duty of the Defendant, Launch Service, to operate said vessel in a reasonable and safe manner, to operate at a speed reasonable and prudent under the circumstances then and there existing, to provide reasonable and adequate warnings concerning known dangers or

dangers which the Defendant should have known existed, and to provide an experience, licensed and trained crew for the operation and maintenance of the vessel.

5.    On April 10, 2003, the Plaintiff Richard Greer boarded the vessel BIG STONE 5, a launch boat, for transit to the tanker ASTRO CAPELLA. At the time the vessel departed on way to the tanker, small craft warning were in effect due to wind and wave conditions.  The operator of the vessel BIG STONE 5 drove the vessel at a high speed through rough waters.  As a result, those aboard, including the Plaintiff, were thrown about the boat.

6.    The Defendant Launch Service was negligent in that it failed to provide an adequate and trained crew; failed to operate the vessel at a speed reasonable and prudent under the circumstances then and there existing; failed to provide the Plaintiff with safe passage; and was otherwise careless and negligent.

7.    As a direct result of the Defendant's negligence, the Plaintiff Richard Greer was proximately caused to sustain serious, painful and permanent injuries to his neck, mid and low back and his body, severe shock to his nerves and nervous system and great mental and emotional suffering and anguish; whereby, he was obliged to receive medical treatment for which expenses were and will continue to be incurred in the future and was and will in the future be prevented from engaging in his usual employment, activities and pursuits and was otherwise injured and damaged.

8.    Plaintiff states that all of the injuries and damages were caused solely by the actions of the Defendant without any action of the Plaintiff thereunto contributing.

9.    As a further direct and proximate result of the aforementioned negligence of Defendant, Plaintiff has incurred in the past and will incur in the future medical and other expenses related to the treatment of his injuries.

2

10.   As a further direct and proximate result of the aforementioned negligence of Defendant, Plaintiff Richard Greer has incurred in the past and will incur in the future considerable pain, suffering and discomfort, both mental and physical in nature.

**WHEREFORE,** Plaintiff demands judgment in her favor and against Defendant for general and special damages, the cost of this action and any other relief this Court deems just.

**MORGAN SHELSBY & LEONI**


_/s/ Gilbert F. Shelsby, Jr._
Gilbert F. Shelsby, Jr. (#2833)
221 Main Street
Stanton, DE 19804
(302) 995-6210
*Attorney for Plaintiff*

DATED: March 31, 2006

3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------x
IN THE MATTER OF COMPLAINT OF
DELAWARE BAY LAUNCH SERVICE, INC. AS
OWNER OF "BIG STONE 5", A 51-FOOT 1985
CREWBOAT, FOR EXONERATION FROM OR
LIMITATION OF LIABILITY
---------------------------------------------------x

CIVIL ACTION
IN ADMIRALTY

No.        0 6 - 3 4 5

## RESTRAINING ORDER, ORDER FOR ISSUANCE OF
## MONITION, ORDER THAT CLAIMS BE FILED WITH CLERK

A Complaint having been filed herein by Delaware Bay Launch Service, Inc. ("Petitioner"),

as owner of the "BIG STONE 5", a certain 51-foot 1985 crewboat built by Breaux Brothers

Enterprises (hereinafter "the Vessel"), claiming exoneration from, or limitation of liability as

provided for by the Revised Statutes of the United States and the various statutes supplementary to

and amendatory thereof, contesting the liability of Petitioner for any and all alleged injuries, losses,

or damage, occasioned by or resulting from the incident described in the Complaint herein, and also

stating the facts and circumstances upon which exoneration from or limitation of liability are

claimed, and it appearing that claims have been or will be made against Petitioner for losses,

damages, or injuries alleged to have resulted in consequence of the incident described in the

Complaint;

NOW, on Motion of Palmer Biezup & Henderson LLP, attorneys for Petitioner, it is

ORDERED, that a Monition issue out of and under the seal of this Court citing all persons

asserting claims with respect to which the Complaint seeks exoneration or limitation and

admonishing them to file their claim with the Clerk of this Court at J. Caleb Boggs Federal Building,

JUN - 2 2006

844 N. King Street, Wilmington, DE 19801 within forty-five (45) days of the entry of this Order, and to serve upon or mail to Palmer Biezup & Henderson LLP, 1223 Foulk Road, Wilmington, DE 19803 the attorneys for Petitioner, a copy thereof, on or before the same date, or be defaulted; and it is further

ORDERED, that the further prosecution of any and all suits, actions or proceedings of any nature or description whatsoever which have already been commenced against Petitioner and/or against the Vessel except in the present proceedings, in respect of any claim arising out of, occasioned by, consequent upon, connected with or arising during the incident described in the Complaint are hereby stayed and restrained until the hearing and determination of this proceeding; and it is further

ORDERED, that upon the signing of this Order, the commencement of any suit, action or proceeding of any nature or description whatsoever against Petitioner and/or against the Vessel, except in the present proceedings, in respect of any claim arising out of, occasioned by, consequent upon, connected with or arising during the voyage upon which the Vessel was then engaged, is hereby enjoined until the hearing and determination in this proceeding; and it is further

ORDERED, that notice of the Complaint for Exoneration from or Limitation of Liability and the Monition pursuant thereof be given as provided by Rule F of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure by publication of a notice, in the form attached hereto, in the "New Journal," a newspaper of general circulation in the State of Delaware, once each week for four successive weeks, and that the first publication of said Notice be at least thirty (30) days before the return date specified above and that Petitioner, not later than the

PDH: 183023.1

-2-

date of the second publication, shall mail a copy of said Notice, together with a copy of this Order to all persons who at the time of making this Order are known by Petitioner to have made any claim against the Vessel or Petitioner arising out of the incident which is the subject of the limitation proceeding, or in cases where such claimants are known by Petitioner to be represented by counsel, to their respective attorneys.

United States District Judge

Dated: May 25, 2006

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

— — —

| | |
|---|---|
| IN THE MATTER OF | : CIVIL ACTION |
| COMPLAINT OF | : IN ADMIRALTY |
| DELAWARE BAY LAUNCH | : |
| SERVICE, INC.  AS | : |
| OWNER OF "BIG STONE 5", | : |
| A 51-FOOT 1985 CREWBOAT, | : |
| FOR EXONERATION FROM OR | : |
| LIMITATION OF LIABILITY | : NO. 06 - 345 (GMS) |

— — —

November 6, 2007

— — —

           Oral deposition of DAVID LEWIS, taken

pursuant to notice, was held at the offices of

SHELSBY & LEONI, 221 Main Street, Stanton, Delaware

19804, commencing at 1:30 p.m., on the above date,

before Hillary Piotrowski, a Notary Public in the

Commonwealth of Pennsylvania.

— — —

MAGNA LEGAL SERVICES
Two Penn Center
1500 John F. Kennedy Boulevard
Suite-910
Philadelphia, Pennsylvania 19102
(866)624-6221

MAGNA LEGAL SERVICES

Page 2

```
1    APPEARANCES:
2    PALMER BIEZUP & HENDERSON
     BY: MICHAEL B. MCCAULEY, ESQUIRE
3    620 Chestnut Street
     956 Public Ledger Building
4    Philadelphia, Pennsylvania 19106
     (215) 625-9900
5    Representing Delaware Bay Launch
6
7
8
9    SALSBURY CLEMENTS BEKMAN MARDER & ADKINS, LLC
     BY: PAUL D. BEKMAN, ESQUIRE
10   Suite 450
     300 West Pratt Street
11   Baltimore, Maryland 21201
     (410) 539-6633
12   Representing Richard Greer
13
14
15
16
17            - - -
18
19
20
21
22
23
24       MAGNA LEGAL SERVICES
```

Page 4

```
1            - - -
2     DEPOSITION SUPPORT INDEX
3            - - -
4
5    Direction to Witness Not to Answer
6    Page  Line  Page Line  Page Line
7    None
8
9    Request for Production of Documents
10   Page  Line  Page Line  Page Line
11   None
12
13   Stipulations
14   Page Line  Page Line   Page Line
15   5   2
16
17   Question Marked
18   Page Line  Page Line  Page Line
19   None
20
21
22
23
24
```

Page 3

```
1            - - -
            I N D E X
2            - - -
3
4    DAVID LEWIS              PAGE
5      By Mr. Bekman          6, 71
6      By Mr. McCauley        70
7
8
9
10           - - -
         E X H I B I T S
11           - - -
12   NO.      DESCRIPTION      PAGE
13        (No exhibits were entered.)
14
15
16
17
18           - - -
19
20
21
22
23
24
```

Page 5

```
1            - - -
2         (It was stipulated by and between
3    counsel that reading, signing,
4    sealing, certification, and filing be
5    waived; and that all objections,
6    except as to the form of the
7    question, be reserved until the time
8    of trial.)
9            - - -
10       David Lewis, after having been
11   first duly sworn, was examined and
12   testified as follows:
13           - - -
14        EXAMINATION
15           - - -
16   BY MR. BEKMAN:
17   Q   Can you give us your full name, please?
18   A   David Lewis.
19   Q   And it is L-E-W-I-S?
20   A   Yes, sir.
21   Q   Where do you live, Mr. Lewis?
22   A   20933 Cubbage Pond Road, Lincoln, Delaware
23   10960.
24   Q   And how far is that from where we are?
```

Page 38

1    Q   Since ever.
2    A   Yes. I see the logbook every day.
3    Q   Have you looked at it recently?
4    A   When I go into work, I look at the log
5    every day.
6    Q   Have you looked at the entry for April the
7    10th, 2003?
8    A   No.
9    Q   Ever?
10   A   On what date?
11   Q   On any date since then?
12   A   For that date?
13   Q   Yes.
14   A   Probably that morning.
15   Q   Have you seen it since?
16   A   No.
17   Q   So, sitting here today, you don't know
18   whether there were any recordings made about the
19   weather, or the wind, on April the 10th, 2003?
20   A   That's correct.
21   Q   Have you looked at the launch ticket for
22   that date?
23   A   On that date I did.
24   Q   Since then?

Page 39

1    A   Once.
2    Q   And what do you remember about it saying?
3    A   Name of the vessel, and who I was taking
4    out.
5    Q   What was the name of the vessel?
6    A   Astro -- I'm not sure the last name --
7    Capella, something like that.
8    Q   And what was the vessel that was taken
9    out, which launch?
10   A   Big Stone Express.
11   Q   That's a 78-footer?
12   A   Yes, sir.
13   Q   And what was the time you left?
14   A   Approximately 1700.
15   Q   And what was the time you dropped
16   Mr. Greer off?
17   A   17:45; maybe a little bit before, maybe a
18   little after.
19   Q   And do you remember who was with you at
20   the time, besides Mr. Greer?
21   A   I'm guessing; it should have been Tony
22   Ferguson.
23   Q   When you say "you're guessing," is that
24   your best recollection?

Page 40

1    A   My best recollection, I believe it was
2    Tony.
3    Q   Okay. The logbook for that date still
4    exists?
5    A   I'm sure it does.
6    Q   What other written notations, besides the
7    launch ticket and the logbook, would tell us
8    anything about that day, or that vessel?
9    A   Which vessel?
10   Q   The Express.
11   A   Nothing in the logbook in our log to write
12   the trips down; it does not specify what boat to
13   take.
14   Q   Right. You told me about the launch
15   ticket. You told me about the logbook. Is there
16   anything else, besides those two things, that would
17   tell us anything about the trip that day that
18   Delaware Launch has?
19   A   No.
20   Q   On a particular day, let's say, April 10,
21   2003, does anybody at Delaware Launch independently
22   look at the wind gauge, and write down what the
23   weather is on any document?
24        MR. MCCAULEY: Objection of the

Page 41

1    form.
2         THE WITNESS: There could be --
3    anybody can write, you know, "it's raining," "a
4    blowout tide," what the blowout tide is.
5    BY MR. BEKMAN:
6    Q   Where would they write that?
7    A   Usually in the margin off to the side at
8    whatever time; for example, low water's noon,
9    blowout tide 2 feet below normal. I personally
10   would write down, "blowout tide, 12:00, minus two
11   point" -- whatever it's supposed to be. To let me
12   know, to let the other operators know, that at that
13   time, you will not get a boat out.
14   Q   But where it is written in the margin, of
15   what?
16   A   In the log.
17   Q   But I'm talking about other than the
18   launch ticket, and other than the log book for the
19   vessel; is there any other place in any other
20   document that you know of where weather or wind
21   conditions would be noted?
22   A   No.
23   Q   When Mr. Greer was transported in the past
24   out to the Anchorage, would he stand or sit in a

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

IN THE MATTER OF COMPLAINT OF          )
DELAWARE BAY LAUNCH SERVICE,           )    CIVIL ACTION
INC. AS OWNER OF "BIG STONE 5", A      )    IN ADMIRALTY
51-FOOT 1985 CREWBOAT, FOR             )
EXONERATION FROM OR LIMITATION         )    NO. 06-345 (GMS)
OF LIABILITY                           )
                                       )


              Deposition of H. HICKMAN ROWLAND, JR.,
taken pursuant to notice at the law offices of Morgan,
Shelsby & Leoni, 221 Main Street, Stanton, Delaware,
beginning at 2:40 p.m. on Thursday, January 10, 2008,
before Terry Barbano Burke, RMR-CRR and Notary Public.

**Page 2**

1  APPEARANCES:

2

3    PAUL D. BEKMAN, ESQUIRE

4    Salsbury Clements Bekman Marder & Adkins, LLC

5      300 West Pratt Street, Suite 450

6      Baltimore, Maryland 21201

7      For the Plaintiff

8

9    MICHAEL B. McCAULEY, ESQUIRE

10    Palmer Biezup & Henderson

11      1223 Foulk Road

12      Wilmington, Delaware 19803

13      For the Defendant

14

15

16

17

18

19

20

21

**Page 3**

1          H. HICKMAN ROWLAND, JR.,

2      the deponent herein, having first been

3        duly sworn on oath, was examined and

4        testified as follows:

5  BY MR. BEKMAN:

6    Q.  Mr. Rowland, give us your full name and tell

7  us your professional address, please.

8    A.  Okay. H. Hickman Rowland, Jr.  My

9  professional address is Post Office Box 389, New

10  Castle, Delaware, 19720.

11    Q.  Do you fit in that post office box?

12    A.  Very well.

13        I can give you an office address.

14    Q.  Why don't you.

15    A.  Office address is, let me get this right now,

16  is 11 Gist, G-I-S-T, Road, Port of Wilmington,

17  Wilmington, Delaware, 19801.

18    Q.  Have you ever had your deposition taken before

19  similar to this?

20    A.  Yes.

21    Q.  So you probably know a little bit about what's

**Page 4**

1  going to happen, Mr. McCauley has probably advised you.

2  I'm going to be asking you some questions today. It's

3  important that you understand the questions that I ask.

4  If you do not understand a question that I ask, tell

5  me. I'll try to rephrase it so it is understandable.

6    A.  Okay.

7    Q.  The court reporter will be taking down

8  everything you say.  If you nod or if you shake your

9  head or if you say uh-huh, uh-uh, it may not be

10  interpreted correctly, so you have to give a verbal

11  response.

12    A.  Very well.

13    Q.  Also, it's very hard for her to take down

14  testimony if you and I are talking at the same time, so

15  I'll try to wait for you and you can wait for me.

16    A.  Very well.

17    Q.  Can you tell me today with whom you are

18  employed?

19    A.  I'm employed by Wilmington Tug, Inc.

20    Q.  And Wilmington Tug, Inc., is a Delaware

21  corporation?

**Page 5**

1    A.  It's a Delaware corporation, yes, sir.

2    Q.  And in what capacity are you employed by

3  Wilmington Tug, Inc.?

4    A.  I am the president of Wilmington Tug, Inc.

5    Q.  And Wilmington Tug, Inc., is what type of a

6  company?

7    A.  C corporation.

8    Q.  And what is its relationship with Delaware Bay

9  Launch Service, Inc.?

10    A.  Wilmington Tug owns 100 percent of Delaware

11  Bay Launch Service, Inc.

12    Q.  Is Wilmington Tug, Inc., a holding company in

13  the sense that it basically may own a company but

14  doesn't have any operational work?

15    A.  No, it is not a holding company in that sense.

16    Q.  It has an operational capacity?

17    A.  Yes.

18    Q.  What type of work is it engaged in?

19    A.  Wilmington Tug is engaged in owning and

20  operating tugboats primarily on the Delaware River.

21    Q.  And that's separate and apart from Delaware

**2 (Pages 2 to 5)**

# H. Hickman Rowland, Jr.

## Page 6

1 Bay Launch Service?

2 A. That's correct.

3 Q. Is Delaware Bay Launch, Inc., a stock company?

4 A. It's a C corporation, has stock. All the

5 stock happens to be owned by Wilmington Tug.

6 Q. Do you have any position with Delaware Bay

7 Launch Service, Inc.?

8 A. Yes.

9 Q. What is that position?

10 A. I am president of Delaware Bay Launch Service,

11 Inc.

12 Q. Who are the other officers of Delaware Bay

13 Launch?

14 A. My son Christopher Rowland is secretary.

15 Q. Is that the only other officer?

16 A. Yes.

17 Q. Is he involved in an operational capacity?

18 MR. McCAULEY: Objection to the form,

19 "operational."

20 BY MR. BEKMAN:

21 Q. You can answer.

## Page 7

1 A. Yes, he has a lot to do with Delaware Bay

2 Launch.

3 Q. Does Wilmington Tug, Inc., own any other

4 companies other than Delaware Bay Launch Service, Inc.?

5 A. No, sir.

6 Q. Do you know if Delaware Bay Launch Service,

7 Inc., owns any other companies?

8 A. They do not.

9 Q. Does Delaware Bay Launch Service, Inc., have

10 any chief operating officer as opposed to a president?

11 A. No. I'm the chief operating officer.

12 Q. And president?

13 A. Yes.

14 Q. Are you involved in the day-to-day operations

15 of Delaware Bay Launch Service?

16 A. Not the day-to-day, no, sir.

17 Q. Who would that be? Is there some person who

18 would be the day-to-day operating person for Delaware

19 Bay Launch?

20 A. That would be our manager, David Brown.

21 Q. Is there more than one manager?

## Page 8

1 A. No.

2 Q. How long has he been the manager?

3 A. I don't know exactly, but it was approximately

4 1991/1992.

5 Q. So in April of 2003 when this incident

6 occurred, you were the president of Delaware Bay

7 Launch?

8 A. Correct.

9 Q. And Mr. Brown was the manager?

10 A. Correct.

11 Q. Were there any other, quote unquote,

12 managerial employees besides you, Mr. Brown, and your

13 son Christopher in April of 2003?

14 A. Well, the quick answer is no. I'm not sure my

15 son was with me in April of 2003. He has been with me

16 about five years, so we are very close.

17 Q. I understand.

18 So other than you and Mr. Brown and

19 maybe your son, those would have been the, quote

20 unquote, managerial employees of Delaware Bay Launch in

21 April of 2003?

## Page 9

1 A. That's correct.

2 Q. What would be the responsibilities of

3 Mr. Brown on a day-to-day basis in April of 2003?

4 A. Mr. Brown just operates the business. He sees

5 that the employees are there to go to work. He runs

6 the boats himself when needed. He makes sure the boats

7 have fuel and that the business just functions sort of

8 as a manager of any sort of facility would do.

9 Q. And what were your responsibilities as of

10 April of 2003?

11 A. Well, I did a lot, I do a lot of things as the

12 chief executive officer would do. I'm in charge of the

13 marketing of the business. I deal with the customers

14 of the business. I set the policies for the business.

15 Any major acquisitions that we might do and purchases

16 or any major repair maintenance that we might do, I am

17 in charge of signoff on all of those.

18 Q. Where are you physically located during the

19 day?

20 A. Primarily in my office in Wilmington.

21 Q. And where does Delaware Bay Launch have its

3 (Pages 6 to 9)

# H. Hickman Rowland, Jr.

**Page 10**

1  vessels?

2  A.  **Slaughter Beach, Delaware.**

3  Q.  How far would that be from Wilmington?

4  A.  **It's approximately 50 miles.**

5  Q.  So you're not physically located at the site?

6  A.  **Correct.**

7  Q.  And that would be typical of you to be in

8  Wilmington and not be at Slaughter Beach?

9  A.  **That's correct.**

10  Q.  And Mr. Brown, I take it, would be at

11  Slaughter Beach?

12  A.  **That's correct.**

13  Q.  And typically what was the business of

14  Delaware Bay Launch in April of 2003?

15  A.  **Our business is really to transport people and**

16  **ship supplies to and from ships either anchored in Big**

17  **Stone Beach anchorage or transiting the lower part of**

18  **Delaware Bay or in the Atlantic Ocean.**

19  Q.  And how long has Delaware Bay Launch Service

20  been in existence?

21  A.  **Since 1973.**

**Page 11**

1  Q.  And were you the owner then?

2  A.  **Yes.**

3  Q.  So you have been the owner as long as it has

4  been in existence?

5  A.  **That's correct.**

6  Q.  And you were the person who has been the

7  president the whole time?

8  A.  **That's correct.**

9  Q.  Helped incorporate it?

10  A.  **Yes, that's correct.**

11  Q.  Tell me a little bit about your background,

12  let's talk about education.

13  A.  **Okay.**

14  **I graduated from the Wharton School at**

15  **the University of Pennsylvania in economics. Went to**

16  **work on Wall Street, in the investment business there,**

17  **and Philadelphia. And in 1971, I joined my father, who**

18  **had one tugboat at the little Port of Wilmington, and**

19  **that was in '71. And in that tugboat business since**

20  **then.**

21  Q.  When did you go to Wharton?

**Page 12**

1  A.  **Graduated in 1962, so I guess '58 to '62.**

2  Q.  So what did you do between '62 and '91, you

3  were on Wall Street?

4  A.  **Well, I was in the investment banking**

5  **business. My first couple years were in New York, and**

6  **then I was in Philadelphia for four years. And then I**

7  **retired for four years and I went to Australia, and**

8  **then came back to be in the tugboat business.**

9  Q.  Have you ever held any marine licenses?

10  A.  **Yes.**

11  Q.  What type?

12  A.  **I am a first class, I hold a first class river**

13  **pilot's license for sections of the Delaware River. I**

14  **hold a tugboat master's license to operate as captain**

15  **of a tugboat.**

16  Q.  How long have you had that?

17  A.  **I got probably, my tugboat license I got in**

18  **probably 1973, would be my best guess, in approximately**

19  **that time.**

20  **My first class pilot's license I got in**

21  **1978.**

**Page 13**

1  Q.  Have you maintained both of those?

2  A.  **Yes.**

3  Q.  They're still active?

4  A.  **Yes.**

5  Q.  Have you ever operated any of the Delaware Bay

6  Launch vessels?

7  A.  **Yes.**

8  Q.  In a working capacity?

9  A.  **Yes.**

10  Q.  Have you ever operated the BIG STONE EXPRESS?

11  A.  **No.**

12  Q.  Or the BIG STONE 5?

13  A.  **No.**

14  Q.  As of April of 2003, approximately how many

15  vessels did Delaware Bay Launch Service own?

16  A.  **In 1973?**

17  Q.  In 2003.

18  A.  **In 2003, they owned four vessels.**

19  Q.  And they would be which ones?

20  A.  **They would be the BREAKWATER, the BIG STONE 5,**

21  **the BIG STONE EXPRESS, and the BIG STONE PRIDE.**

## H. Hickman Rowland, Jr.

**Page 14**

1    I would have to check the purchase of
2    the BIG STONE PRIDE, that it was in approximately that
3    time frame that we bought it. So I would not be 100
4    percent sure.
5    Q.   Were you involved in the purchase of all of
6    the vessels?
7    A.   Every one of them.
8    Q.   The BIG STONE EXPRESS is about 85 feet?
9    A.   77.
10   Q.   77. And how about the BIG STONE 5?
11   A.   The BIG STONE 5 is 50.
12   Q.   Do you know or have you ever met Richard
13   Greer?
14   A.   Yes, sir.
15   Q.   And when did you first meet him?
16   A.   I first met him, and I'm not good on years and
17   memories or those sort of things, but I met him when he
18   was a captain for us at Delaware Bay Launch Service
19   when he ran our launches as captain.
20   Q.   How long, if you can recall, did he work
21   there?

**Page 15**

1    A.   I can't recall.
2    Q.   Do you remember anything about his work, the
3    quality of his work?
4    A.   Yes, in the sense that we were extremely
5    satisfied with him as a captain. We were sorry that he
6    left us. He was a very good employee for us.
7    Q.   Do you know about how many years he worked,
8    ballpark?
9    A.   If you say ballpark, I would say five years.
10   Q.   Can you tell me how it works? Let's just say,
11   for example, Delaware Bay Launch Service will transport
12   somebody from shore to a vessel, for whatever reason,
13   that may be in the anchorage. Do you have a contract
14   where you basically carry employees of a particular
15   company to a site, or do you charge on the basis of
16   each trip? How do you work that?
17           MR. McCAULEY: Just let me put an
18   objection to the form.
19           MR. BEKMAN: Sure.
20           MR. McCAULEY: It was like three
21   questions, but I think you're just trying to give him

**Page 16**

1    some context.
2            MR. BEKMAN: Sure, exactly.
3            THE WITNESS: We charge per trip. We
4    charge a passenger per trip.
5    BY MR. BEKMAN:
6    Q.   So let's say, for example, Mr. Greer, in April
7    of 2003, is an employee of Maritrans. Do you have a
8    contract with Maritrans whereby you agree to transport
9    their employees and you bill them on the basis of how
10   many trips you make?
11   A.   I do not have a contract, but we do bill them
12   on the number of trips we make.
13   Q.   So a person would make an appointment and make
14   a contact with your firm for transport and would
15   identify who they are from and then, for example, they
16   may be an individual, but the fee would be billed to
17   their employer?
18   A.   That's correct.
19   Q.   Is that typically how it's worked?
20   A.   Yes.
21   Q.   And they would contact the Slaughter Beach

**Page 17**

1    location for transport?
2    A.   That's correct.
3    Q.   Are all of the Delaware Bay Launch vessels
4    berthed at Slaughter Beach?
5    A.   Yes.
6    Q.   And what would determine which vessel is being
7    used on a particular day?
8    A.   That would be up to David Brown, and in some
9    cases it may be up to the individual captain.
10   Q.   Captain, meaning captain of the vessel?
11   A.   Of the vessel.
12   Q.   And does each vessel have the same complement
13   of crew?
14   A.   Yes.
15   Q.   Two?
16   A.   Yes.
17   Q.   Captain, deck hand?
18   A.   Correct.
19   Q.   And as of April of 2003, can you approximate
20   how many employees you had who were involved either as
21   captain or deck hand for Delaware Bay Launch?

## H. Hickman Rowland, Jr.

**Page 18**

1  A.  I can approximate.

2  Q.  Approximate.

3  A.  I would say four captains and four deck hands.

4  Q.  Do you have any personal knowledge of the

5  incident of April 10th, 2003?

6  A.  No.

7      MR. McCAULEY:  Objection.

8  BY MR. BEKMAN:

9  Q.  When was your first knowledge at all of

10  anything related to that incident?

11      MR. McCAULEY:  Objection to "incident."

12  Form.

13      THE WITNESS:  The first knowledge I had

14  was when I got a piece of paper saying that we were

15  being sued.

16  BY MR. BEKMAN:

17  Q.  Lawsuit?

18  A.  Yes.

19  Q.  Before today, have you reviewed any documents

20  in preparation for this deposition?

21  A.  No.

**Page 19**

1  Q.  Have you seen any?

2  A.  No.

3  Q.  Can you tell me a little bit about the

4  procedure that may exist as of April of 2003 when a

5  vessel of Delaware Bay Launch is going to take a trip,

6  take a voyage, if you will, to transport somebody to a

7  ship that may be at anchorage, as to whether there are

8  any written policies or procedures that relate to

9  whether a vessel should leave the dock and make the

10  trip because of weather conditions?

11  A.  There are no written.

12  Q.  Are there any standard operating procedures,

13  even though they're not written, that may relate to

14  that?

15  A.  Yes.  The standard operation procedure for

16  making trips is that it is the responsibility of the

17  captain to make the trip, if he feels that there is a

18  reasonable chance of being able to board the person on

19  the vessel, that he has to board them, or to take them

20  off.

21  Q.  So the decision as to making the trip is left

**Page 20**

1  to the discretion of the captain of the vessel?

2  A.  Absolutely.

3  Q.  And are the captains of the vessels told that?

4  A.  Yes.

5  Q.  And if the captain of the vessel determines

6  that it is not appropriate to make a trip, they won't?

7  A.  That is correct.

8  Q.  Whether it's because of wind, whether it's

9  because of seas, or a combination of both?

10      MR. McCAULEY:  Objection.

11  BY MR. BEKMAN:

12  Q.  True?

13      MR. McCAULEY:  It could be all kinds of

14  things.

15      THE WITNESS:  It could be all kinds of

16  things, but of those, yes, that's part of it.

17  BY MR. BEKMAN:

18  Q.  It could be wind and seas?

19  A.  It could be.

20  Q.  And are you aware of circumstances before

21  April of 2003 where a vessel did not leave the dock

**Page 21**

1  because of the wind and seas that existed at the time?

2  A.  I'm aware of one.

3  Q.  When would that have been?

4  A.  I have no idea.

5  Q.  Do you remember the circumstances?

6  A.  Yes.

7  Q.  Tell me about them.

8  A.  I had a call from David Brown, who was the

9  captain of the vessel at the time, called me and said,

10  Hick, I've just returned to the dock from a trip out in

11  the bay, and we have a scheduled trip to take a river

12  pilot to a ship some time in the very near future, and

13  I don't think that I can board him under the conditions

14  that exist in the bay, and I'm notifying the pilots of

15  that, that we don't think the conditions are such that

16  it's safe to board them there and don't feel that they

17  should send their pilot up to our launch.  And I just

18  want you to know this, because at that time we had

19  commercial concerns with the pilots.  They were a huge

20  customer of ours and he just wanted me to be aware that

21  this is what he was going to do.

# H. Hickman Rowland, Jr.

**Page 22**

1    Q.   What did you tell him?

2    A.   I said, David, if that's your decision, then I

3 abide by that.

4    Q.   Have there been occasions where you have been

5 called by Mr. Brown or by others to get your input as

6 to whether or not they should go out?

7    A.   None that I know of, that I recall, no.

8    Q.   Is that because you leave it in their

9 discretion?

10    A.   Absolutely.

11    Q.   Have there ever been any meetings or

12 discussions with your captains, for example, where you

13 have discussed that, well, you know, if there are gale

14 warnings or if the wind is such and such on the

15 Beaufort scale, you shouldn't go out?

16    A.   Absolutely not.

17    Q.   Again, it is left to the discretion of the

18 captain?

19    A.   Absolutely.

20    Q.   Is there an operations manual or a manual that

21 relates to operations for any of the launches of

**Page 23**

1 Delaware Bay Launch as of April of 2003?

2    A.   No, sir.

3    Q.   The vessels of Delaware Bay Launch, do they

4 have a standardized communication system when they have

5 left the dock? For example, do they have shipboard

6 communication to the shore?

7    A.   Yes.

8    Q.   What's the nature of it?

9    A.   It's called a VHF radio.

10    Q.   What channel does it operate on?

11    A.   They operate on Channel 9.

12    Q.   In addition to that, is there a cell phone, do

13 they carry cell phones?

14    A.   If they do, it would be a personal cell phone.

15 It's not a company cell phone.

16    Q.   The company does not provide a personal cell

17 phone?

18    A.   Correct.

19    Q.   It would be something that they themselves

20 would have.

21     Do the captains generally do that, do

**Page 24**

1 they generally carry a cell phone?

2    A.   I have no idea.

3    Q.   Does everybody who goes aboard a vessel for

4 transport get a launch ticket?

5    A.   Yes, as far as I know.

6    Q.   How does that work?

7    A.   Normally for a person who is taking a trip to

8 a ship, in other words, transporting them out to the

9 anchorage or out to the vessel, they would come in the

10 office, they sign a ticket saying that they are making

11 that trip.

12    Q.   And what does the ticket say?

13    A.   It says the name of the launch, it says the

14 name of the vessel that the launch will go to, and it

15 says whether they are going to board or come ashore.

16 And it may say who they work for.

17    Q.   Is that required of everybody who goes aboard

18 a vessel for transport?

19    A.   Yes.

20    Q.   And do you keep those records in the regular

21 course of your business?

**Page 25**

1    A.   Yes.

2     MR. BEKMAN: Mike, I asked if the launch

3 ticket for April 10th could be produced.

4     Do you have that?

5     MR. McCAULEY: Well, yes. I was in the

6 process of producing them in order to exchange the

7 documents that you were going to give me, and since I

8 didn't get any, I didn't complete the process. But I

9 will produce them.

10     MR. BEKMAN: The problem is, is that I

11 may have some questions based upon what the ticket

12 shows of Mr. Rowland, and I certainly don't want to

13 have Mr. Rowland come back again to continue his

14 deposition if I have some questions about them.

15     Do you happen to have them with you

16 today?

17     MR. McCAULEY: What exactly are you

18 requesting right now?

19     MR. BEKMAN: Well, my letter of November

20 the 7th sets forth the documents that I wanted.

21     MR. McCAULEY: Right.

**7 (Pages 22 to 25)**

## H. Hickman Rowland, Jr.

**Page 26**

1    MR. BEKMAN: But what I want at this

2  moment, and I'm trying to identify what he's got as I

3  go through this, is a copy of any and all launch

4  tickets for April 10th, 2003.

5    MR. McCAULEY: I don't have all of them

6  with me.

7    MR. BEKMAN: Is there a launch ticket for

8  2003? April 10th, 2003?

9    MR. McCAULEY: I have one for Richard

10  Greer.

11    MR. BEKMAN: Yes.

12    MR. McCAULEY: Is that the one you want?

13    MR. BEKMAN: It certainly is the one I

14  want.

15    MR. McCAULEY: Okay. I thought you said

16  you wanted all of them.

17    MR. BEKMAN: Well, it says a copy of any

18  launch tickets for April 10th, 2003.

19    MR. McCAULEY: Okay.

20    MR. BEKMAN: But if you have one for

21  Richard Greer, sure.

**Page 27**

1    MR. McCAULEY: All right.

2    I am going to give you this document that

3  you requested, but it's subject to representation at

4  the outset that you were going to be providing me the

5  documents that I have been waiting for for quite some

6  time now.

7    MR. BEKMAN: As I told you, I would, and

8  as we discussed, we will make the exchange.

9    MR. McCAULEY: Well, this isn't an

10  exchange. It's the unilateral production of the one

11  document that you requested as a courtesy, but since

12  you're an honorable man, and I know that you'll give me

13  what I have asked for.

14    MR. BEKMAN: And I will.

15    (Rowland-1 was marked for

16  identification.)

17  BY MR. BEKMAN:

18    Q.  Mr. Rowland, let me show you what we have

19  marked as Exhibit No. 1 and ask if you can take a

20  moment to look at it and tell me if you can identify

21  it.

**Page 28**

1    A.  Both of them?

2    Q.  Actually, the one on the left is the one that

3  I am talking about. It's the April 10th, 2003, even

4  though it has the April 11th ticket on it as well.

5    A.  Okay. This is a, basically a trip ticket for

6  the transport of a Maritrans coordinator aboard the

7  vessel ASTRO CAPELLA at Big Stone Beach anchorage on

8  April the 10th.

9    MR. McCAULEY: Let the record show the

10  witness is reading from this document.

11  BY MR. BEKMAN:

12    Q.  The date is April 10th, 2003?

13    A.  Correct.

14    Q.  The vessel is the BIG STONE EXPRESS?

15    A.  Correct.

16    Q.  And the signature appears to be that of

17  Richard Greer, or can you tell?

18    A.  No, I have no idea.

19    Q.  Is the signature the signature of the person

20  who is going aboard the vessel and being transported?

21    A.  I assume so.

**Page 29**

1    Q.  And the invoice goes to whoever's paying for

2  it?

3    A.  Correct.

4    Q.  And it's leaving from the Big Stone Beach

5  anchorage?

6    A.  It's going to the Big Stone Beach anchorage.

7    Q.  It's going to the Big Stone Beach --

8    A.  That's where the ASTRO CAPELLA is.

9    Q.  And then to the right of the name of the

10  vessel there are some initials. Can you tell me what

11  they are?

12    A.  I have no idea.

13    Q.  If you look at where the checkmark is, do you

14  see where the checkmark is, or the X mark excuse me?

15    A.  Yes.

16    Q.  DL.

17    A.  Yes.

18    Q.  Do you think that that refers to David Lewis?

19    A.  Yes.

20    Q.  Do the other initials suggest the names of

21  captains?

## H. Hickman Rowland, Jr.

**Page 30**

1   A.   Yes.
2   Q.   Who is --
3   A.   Well, I assume they do. I think so.
4   Q.   Who would DB be?
5   A.   David Brown.
6   Q.   And TT?
7   A.   I do not know.
8   Q.   And JB?
9   A.   No, I don't know.
10  Q.   Other than Jim Beam?
11  A.   Exactly.
12       Sorry, I can't do that.
13  Q.   CB?
14  A.   I don't know that either.
15  Q.   How about GL?
16  A.   No. If I thought a little while, I could come
17  up with somebody.
18  Q.   If it hits you, let me know.
19       Is the individual who makes the trip
20  given a copy of this as well, or is this just for
21  purposes of Delaware Bay Launch?

**Page 31**

1   A.   Oh, this is just -- the person who makes the
2   trip, was that the question?
3   Q.   Yes.
4   A.   To my knowledge, not normally.
5   Q.   Not normally given to the person who's being
6   transported?
7   A.   Right.
8   Q.   And I think I asked you this before, but just
9   so it's clear, is there a separate owner's manual or
10  operating manual for each vessel?
11  A.   No.
12  Q.   Do you know a person by the name of either
13  Anthony Ferguson or Tony Ferguson, does that name ring
14  a bell?
15  A.   Yes.
16  Q.   Who is that?
17  A.   Tony Ferguson worked for Delaware Bay Launch
18  Service.
19  Q.   In what capacity?
20  A.   He was a deck hand.
21  Q.   Can you give me an approximation as to when he

**Page 32**

1   may have worked for them?
2   A.   No, sir.
3   Q.   Is he still in your employ?
4   A.   No, sir.
5   Q.   Do you maintain a personnel file for each
6   employee who works for you?
7   A.   We have a bookkeeping file which would
8   indicate when they worked and when they no longer got
9   paid.
10  Q.   And it would indicate, for example, their name
11  and their address and their Social Security number and
12  that type of thing?
13  A.   Correct.
14  Q.   And you have that within your possession?
15  A.   As far as I know.
16       MR. BEKMAN:  Mike, one of the items that
17  I had asked for was a copy of the complete personnel
18  file of Anthony Ferguson.
19       MR. McCAULEY:  We've taken it under
20  advisement.
21       MR. BEKMAN:  You're not going to produce

**Page 33**

1   it here?  You have it, but you're not going to produce
2   it?
3        MR. McCAULEY:  I don't have it so I'm not
4   going to produce it.  I'm not going to testify on the
5   record about this.  I don't have it here today.
6        MR. BEKMAN:  Does this relate to the
7   issue of the exchange of the information between you
8   and me, is that what this is about?
9        MR. McCAULEY:  In part.
10       MR. BEKMAN:  Because is it your position
11  that the only thing you're going to produce today is
12  the launch ticket?
13       MR. McCAULEY:  Yes.
14       MR. BEKMAN:  Then if that's the case,
15  then I think we ought to suspend the deposition and
16  reconvene the deposition at such point in time as
17  you're willing to produce the remainder of the
18  documents, because we're going to be wasting our time
19  and Mr. Rowland's valuable time if we continue this
20  way.  I think I'm entitled to this information.  I told
21  you that I will provide you with the documentation that

**9 (Pages 30 to 33)**

## H. Hickman Rowland, Jr.

**Page 34**

1  you've asked. As I understand it, as it relates to the
2  issues which Mr. Rowland is testifying about today,
3  which are issues relating primarily to liability and
4  privity and knowledge and limitation issues, the only
5  thing that Mr. Greer indicated that he had was some
6  documents that he may have in his garage that he was
7  going to look for.
8       I have provided you with detailed medical
9  information and, as I said to you, and as I will say on
10  the record, I will provide you with everything that you
11  have requested, but for us to not be able to ask
12  Mr. Rowland questions, which I think he is required to
13  do, and the documents be required to be produced, I
14  think it is just counterproductive.
15      MR. McCAULEY: Let me just say that you
16  can ask Mr. Rowland questions regardless of the
17  production of documents, which is what I had to do with
18  Mr. Greer, notwithstanding having had a request for
19  production of documents out and interrogatories out
20  well in advance of his deposition without getting any
21  documents other than medical records, and I proceeded

**Page 35**

1  with his deposition at that time. So I would think
2  that you could proceed with Mr. Rowland's deposition at
3  this time as well.
4       If you suspend the deposition, I'm not
5  bringing him back without a court order.
6       MR. BEKMAN: I will continue to ask him
7  questions, and if the documents are produced and if I
8  have additional questions and you do not agree to
9  produce him, I will seek the relief of the court,
10  because I don't think it's appropriate for you to
11  hamstring me in my giving you a legitimate request for
12  production of documents and a designee and tell me that
13  I can't ask him questions about the documents which you
14  haven't produced.
15      MR. McCAULEY: Well, I think that to the
16  extent that you have that grievance, and I equally have
17  the grievance, Paul --
18      MR. BEKMAN: Okay.
19      MR. McCAULEY: -- because I was
20  handicapped as well in terms of examining Mr. Greer,
21  and I presume that if you believe that once the

**Page 36**

1  exchange of documents is made that there are any
2  questions that you would need to have Mr. Rowland
3  answer, which are not evident from the documents
4  themselves, we can discuss that. And equally, when I
5  finally get documents that I requested from Mr. Greer,
6  we will discuss the issue of whether I need to take his
7  deposition.
8       MR. BEKMAN: And I have no problem with
9  that.
10      MR. McCAULEY: So we can discuss our
11  mutual concern about the same issue, really, even when
12  we reach the point where we decide that it's necessary
13  to do so.
14  BY MR. BEKMAN:
15  Q.  Mr. Rowland, do you know whether or not the
16  BIG STONE EXPRESS had a log book in April of 2003?
17  A.  No.
18  Q.  Do each of the vessels have a log book?
19  A.  I'm really not sure about that.
20  Q.  If they do have a log book and they did exist,
21  would they exist aboard the vessel as opposed to in the

**Page 37**

1  corporate headquarters of Delaware Bay Launch?
2       MR. McCAULEY: Objection to the form. He
3  says he doesn't know.
4  BY MR. BEKMAN:
5  Q.  Do you know?
6  A.  No, I do not know.
7  Q.  When you were operating a vessel, one of the
8  Delaware Bay Launch vessels, did you ever make any
9  entries in any log book?
10  A.  No.
11  Q.  Are there any standard operational procedures
12  that relate to your instructing your employees about
13  entering or making entries in a log book aboard your
14  vessels?
15      MR. McCAULEY: Can you read that back.
16      (The pending question was then read back
17  by the reporter.)
18      THE WITNESS: No.
19  BY MR. BEKMAN:
20  Q.  Do you know whether or not the vessels of
21  Delaware Bay Launch have a certificate of inspection

**10 (Pages 34 to 37)**

## H. Hickman Rowland, Jr.

**Page 38**

1    issued by the United States Coast Guard?

2    A.   Yes.

3    Q.   And is that maintained within the vessel

4    itself or is that maintained within the corporate

5    headquarters?

6    A.   That has to be on the vessel.

7    Q.   Is a copy kept in corporate headquarters?

8    A.   Normally, yes.

9        MR. BEKMAN:  And again, as I understand

10   it, Mr. McCauley, you're not prepared to have that

11   certificate of inspection of the BIG STONE EXPRESS,

12   which I have requested, be produced here today?

13       MR. McCAULEY:  What's your question?

14       MR. BEKMAN:  The certificate of

15   inspection for the BIG STONE EXPRESS?

16       MR. McCAULEY:  That falls within the

17   substance of the discussion we have already had

18   generally about documents.

19       MR. BEKMAN:  As it relates to the

20   personnel file of Anthony Ferguson which I had asked be

21   produced, as I understand it, you are not producing

**Page 39**

1    that today?

2        MR. McCAULEY:  I've already addressed

3    that question.

4    BY MR. BEKMAN:

5    Q.   Do you know, Mr. Rowland, whether or not

6    Mr. Ferguson possessed a Coast Guard license of any

7    kind?

8    A.   I do not know.

9    Q.   Would your personnel file reflect whether he

10   did or didn't?

11   A.   Not my personnel file, no.

12   Q.   What file would?

13   A.   I don't have any idea.

14   Q.   If you have a vessel which transports

15   passengers for hire and the certificate of inspection

16   requires that that operator be licensed, what

17   procedures exist, as of April of 2003, where you could

18   verify whether somebody had a license to do so?

19       MR. McCAULEY:  Objection to the form.

20       THE WITNESS:  My manager of Delaware Bay

21   Launch will verify that anyone employed to act as a

**Page 40**

1    captain of our vessel has a license to do that in

2    regulation with the Coast Guard.

3    BY MR. BEKMAN:

4    Q.   To your knowledge, did Anthony Ferguson ever

5    operate any vessel as a captain, to your knowledge?

6    A.   To my knowledge, no, he did not.

7    Q.   But you do not know whether or not he ever

8    possessed a Coast Guard license?

9    A.   No, I do not.

10       MR. BEKMAN:  It was requested that if

11   there were any Coast Guard licenses issued to

12   Mr. Ferguson, that they be produced.  Do I understand

13   that that falls within the same purview of our

14   discussion?

15       MR. McCAULEY:  Yes, it does.

16       MR. BEKMAN:  And you are not going to

17   produce any such documentation today?

18       MR. McCAULEY:  If such documentation

19   exists, it's not going to be produced today.

20   BY MR. BEKMAN:

21   Q.   Did you take a look or have you looked at

**Page 41**

1    Captain Lewis's deposition?

2    A.   No.

3    Q.   When he was deposed, he indicated that he had

4    given a statement about the happening of this incident

5    in April of 2003.

6        Do you know whether or not any such

7    statement exists?

8        MR. McCAULEY:  Objection to the form.

9        THE WITNESS:  I do not.

10       MR. BEKMAN:  Again, does this fall within

11   the purview of what we discussed earlier, that if such

12   exists, you are not producing it today?

13       MR. McCAULEY:  Yes.  I said three

14   questions ago on this same subject that all such

15   documents fall within the purview of our discussion on

16   the record about ten minutes ago.

17       MR. BEKMAN:  You mean all such documents

18   that I have requested?

19       MR. McCAULEY:  Yes.  And all such

20   documents I have requested.

21   BY MR. BEKMAN:

**11 (Pages 38 to 41)**

## H. Hickman Rowland, Jr.

**Page 42**

1    Q.    Mr. Rowland, do you have any knowledge as to
2    reporting requirements to the United States Coast Guard
3    in the event that someone may be injured on board one
4    of your vessels?
5    **A.    Do I have knowledge --**
6    Q.    Do you have knowledge as to the reporting
7    requirements if someone is injured aboard one of your
8    vessels, that is to the United States Coast Guard?
9    **A.    No, I do not know about those requirements,**
10   **no.**
11   Q.    Have you ever seen any reports issued to the
12   United States Coast Guard by Delaware Bay Launch about
13   someone who may have sustained an injury aboard any of
14   the Delaware Bay Launch vessels?
15   **A.    Yes.**
16   Q.    Do you maintain those in a particular location
17   within your business?
18   **A.    They would be located in my office.**
19   Q.    Do you know whether or not any such document
20   exists with regard to this incident?
21   **A.    No.**

**Page 43**

1    Q.    You do not know?
2    **A.    I do not know.**
3    Q.    Have you ever seen any statement that
4    Mr. Greer may have given to anyone concerning the
5    happening of this incident?
6    **A.    No, sir.**
7        MR. BEKMAN:    Let me ask that the court
8    reporter mark my letter of November 7th as an exhibit.
9        (Rowland-2 was marked for
10   identification.)
11   BY MR. BEKMAN:
12   Q.    Have you seen this letter?
13   **A.    No, sir.**
14   Q.    And that's Exhibit No. 2?
15   **A.    Correct.**
16       MR. BEKMAN:    I want the record to reflect
17   that on November the 7th, 2007, I faxed a letter to
18   Mr. McCauley concerning the deposition of a designee
19   and the production of documents, and it lists the
20   category of 14 documents and subparts.    And pursuant to
21   our discussion that has taken place here today, the

**Page 44**

1    only document that has been produced and marked as
2    Exhibit No. 1 is the Delaware Bay Launch Service launch
3    ticket of April the 10th, 2003, and that as of this
4    point in time, counsel has refused to produce these
5    documents until he has received documents from the
6    plaintiff.
7    BY MR. BEKMAN:
8    Q.    Mr. Rowland, as far as the conditions that may
9    have existed on April the 10th, 2003, at the --
10       MR. McCAULEY:    Let me just respond to
11   that statement.    I don't have the letter with me but I
12   don't think there's any dispute that I communicated
13   with plaintiff's counsel either late last week or early
14   this week and requested that we exchange the documents
15   that both were requested of the plaintiff formally by
16   request for production of documents, as well as
17   documents that had been testified at the plaintiff's
18   deposition.    And that letter was not responded to, and
19   so therefore no exchange occurred before today.
20       MR. BEKMAN:    Let the record further
21   reflect that my letter was sent to Mr. McCauley on

**Page 45**

1    November 7th, 2007, and I did receive an e-mail from
2    him on January the 7th, 2008, two months later, making
3    that request.    And based upon the representations that
4    have been -- I will get to that in a minute.
5    BY MR. BEKMAN:
6    Q.    As to what the conditions were at the pier of
7    Delaware Bay Launch at Slaughter Beach on April the
8    10th, 2003, you have no personal knowledge?
9    **A.    None.**
10   Q.    Have you ever spoken to any individuals who
11   were down at Slaughter Beach on that day about the
12   weather conditions that existed that day?
13   **A.    No, sir.**
14   Q.    Do you know where you were on that day?
15   **A.    I have no idea.**
16   Q.    If you are not available, for example, on a
17   particular day, and a question is asked, someone's
18   attempting to contact you, and assuming that your son
19   Christopher was not available, who in the corporate
20   office could answer an operational question
21   like, "Should we go out today?"

**12 (Pages 42 to 45)**

**Page 46**

1          MR. McCAULEY: Objection to the form.

2    BY MR. BEKMAN:

3    Q.   Would there be anybody?

4    A.   That question is not asked.

5    Q.   Is that because of your earlier testimony that

6    it is absolutely within the discretion of the captain

7    who is --

8    A.   Absolutely.

9    Q.   -- who is on the beach to determine --

10   A.   Absolutely.

11   Q.   -- whether or not to go out; correct?

12   A.   Correct.

13         MR. BEKMAN: Let the record reflect that

14   without the production of the documents which I had

15   asked for on November the 7th, I cannot determine

16   whether there are any further questions that I want to

17   ask Mr. Rowland at this time, and I'm going to reserve

18   the right, either with agreement of counsel or through

19   relief from the court, to reconvene Mr. Rowland's

20   deposition for the purpose of discussing those issues

21   at such time as I receive the documentation.

**Page 47**

1          I have no further questions.

2          COURT REPORTER: Reading and signing?

3          MR. McCAULEY: I think we have the usual

4    stipulations going in this process. We are not waiving

5    reading and signing.

6          MR. BEKMAN: Reading, signing,

7    certification and filing are all preserved.

8          MR. McCAULEY: But the general

9    stipulation, all objections except as to form are

10   reserved, and reading, signing, of course there is no

11   filing, are all reserved with the exception they are

12   not waived. Depending upon how the transcript looks.

13         (Witness excused.)

14         (The deposition concluded at 3:35 p.m.)

15

16

17

18

19

20

21

**Page 48**

1              I N D E X

2    DEPONENT: R. HICKMAN ROWLAND, JR.     PAGE

3      Examination by Mr. Bekman          2

4

5              E X H I B I T S

6

7    PLAINTIFF'S DEPOSITION EXHIBITS       MARKED

8

9    Rowland-1   Trip tickets             23

10

11   Rowland-2   Letter dated November 7, 2007   37

12

13   ERRATA SHEET/DEPONENT'S SIGNATURE     PAGE 42

14

15   CERTIFICATE OF REPORTER               PAGE 4

16

**Page 49**

REPLACE THIS PAGE
WITH THE ERRATA SHEET
AFTER IT HAS BEEN
COMPLETED AND SIGNED
BY THE DEPONENT

## H. Hickman Rowland, Jr.

**Page 50**

1  State of Delaware   )
2                     )
3  New Castle County  )
4
5          CERTIFICATE OF REPORTER
6
7      I, Terry Barbano Burke, RMR-CRR and Notary
8  Public, do hereby certify that there came before me on
9  Thursday, January 10, 2008, the deponent herein,
10  H. HICKMAN ROWLAND, JR., who was duly sworn by me and
11  thereafter examined by counsel for the respective
12  parties; that the questions asked of said deponent and
13  the answers given were taken down by me in Stenotype
14  notes and thereafter transcribed by use of
15  computer-aided transcription and computer printer under
16  my direction.
17      I further certify that the foregoing is a true
18  and correct transcript of the testimony given at said
19  examination of said witness.
20      I further certify that I am not counsel,
21  attorney, or relative of either party, or otherwise

**Page 51**

1      interested in the event of this suit.

2

3

4

5          Terry Barbano Burke, RMR-CRR

6          Certification No. 233-RPR

7          (Expires January 31, 2008)

8

9      DATED:

10

## DELAWARE BAY LAUNCH SERVICE, INC.

☒ Big Stone Beach Anchorage
☐ Breakwater Anchorage
☐ _____ Buoy
☐ _____
☐ _____

Date: April 11 2003
Underway: _____
Alongside: _____
Ashore: 0235

☐ Breakwater
☒ Big Stone Express
☐ Big Stone 5

☐ DB      ☐ DL
☐ TT      ☐ JB
☐ CB      ☐ GL
☐         ☐

VESSEL  Genmar Zoe Astro Capella #400 / Int

**LAUNCH SERVICE**

☐ Agent Aboard/Ashore _____ Rep. Aboard/Ashore
☒ Coord. Aboard/Ashore _____ Surveyor Aboard/Ashore
☐ _____ Crewmen Aboard _____ Papers Aboard/Ashore
☐ _____ Crewmen Ashore _____ Tech. Aboard/Ashore
☐ Pilot Aboard/Ashore _____ Lifts Of Stores/Spares Aboard
☐ Stand-by Time: _____ Lifts Of Stores/Spares Aboard
☐ Other _____
☐ Truck Loaded/Unloaded: _____

Signature: _____
Print Name: _____
Company Name: _____
Invoice To: Martrans

---

## DELAWARE BAY LAUNCH SERVICE, INC.

☒ Big Stone Beach Anchorage
☐ Breakwater Anchorage
☐ _____ Buoy
☐ _____
☐ _____

Date: 10 April 2003
Underway: 1700
Alongside: _____
Ashore: _____

☐ Breakwater
☒ Big Stone Express
☐ Big Stone 5

☐ DB      ☐ DL
☐ TT      ☐ JB
☐ CB      ☐ GL
☐         ☐

VESSEL  Astro Capella   Int.

**LAUNCH SERVICE**

☐ Agent Aboard/Ashore _____ Rep. Aboard/Ashore
☒ Coord. Aboard/Ashore _____ Surveyor Aboard/Ashore
☐ _____ Crewmen Aboard _____ Papers Aboard/Ashore
☐ _____ Crewmen Ashore _____ Tech. Aboard/Ashore
☐ Pilot Aboard/Ashore _____ Lifts Of Stores/Spares Aboard
☐ Stand-by Time: _____ Lifts Of Stores/Spares Aboard
☐ Other _____
☐ Truck Loaded/Unloaded: _____

Signature: _____
Print Name: _____
Company Name: _____
Invoice To: Martrans

DEPOSITION
EXHIBIT
Nov Lord —
11/10/08 TB
PENGAD 800-631-6989

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

---

IN THE MATTER OF COMPLAINT OF
DELAWARE BAY LAUNCH SERVICE, INC. AS
OWNER OF "BIG STONE 5", A 51-FOOT 1985
CREWBOAT, FOR EXONERATION FROM OR
LIMITATION OF LIABILITY

CIVIL ACTION
IN ADMIRALTY

No.

---

## AFFIDAVIT OF VALUE

Michael B. McCauley, Esquire, being duly sworn according to law, deposes and says that he is a partner with the law firm of Palmer Biezup & Henderson LLP, attorneys for the Petitioner herein and he is authorized to make this Affidavit on behalf of Delaware Bay Launch Service, Inc., as owner of the "BIG STONE 5", a certain 51-foot 1985 crewboat built by Breaux Brothers Enterprises (hereinafter "the Vessel").

After the incident alleged in the Complaint, upon information and belief, the Vessel had a fair market value of one-hundred thousand dollars and zero cents ($100,000.00), and there was no freight then pending. This valuation is based upon the local market value of similar vessels in similar condition at the time of the alleged incident.

Petitioner hereby undertakes to pay any costs that may be required in connection with this limitation proceeding upon Order of this Honorable Court.

PBH: 183023.1

-1-

JUN - 2 2006

Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.

Executed on May 24th, 2006

Michael B. McCauley

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN THE MATTER OF THE COMPLAINT OF DELAWARE BAY LAUNCH SERVICE, INC., AS OWNER OF "BIG STONES 5", A 51-FOOT 1985 CREWBOAT, FOR EXONERATION FROM OR LIMITATION OF LIABILITY | CIVIL ACTION NO.: 06-345 GMS<br><br>IN ADMIRALTY |

## ORDER

NOW THIS _____ day of _____, 2008, the Court after considering

Claimant Richard Greer's Motion for Summary Judgment, hereby orders that Plaintiff's complaint

dismissed with prejudice.

_____
Chief Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN THE MATTER OF THE COMPLAINT OF DELAWARE BAY LAUNCH SERVICE, INC., AS OWNER OF "BIG STONES 5", A 51-FOOT 1985 CREWBOAT, FOR EXONERATION FROM OR LIMITATION OF LIABILITY | CIVIL ACTION NO.: 06-345 GMS<br><br>IN ADMIRALTY |

## CERTIFICATE OF SERVICE

I hereby certify that on March 14, 2008, I electronically filed Claimants Motion for

Summary Judgment with the Clerk of the Court using CM/ECF which will send notification of

such filing to the following:

> Michael B. McCauley, Esquire
> **PALMER, BIEZUP & HENDERSON, LLP**
> 1223 Foulk Road
> Wilmington, DE 19803

> **SHELSBY & LEONI**

> /s/ Michael J. Logullo
> MICHAEL J. LOGULLO
> mlogullo@mslde.com
> 221 Main Street
> Stanton, DE 19804
> 302-995-6210
> *Attorney for Claimant*

1